There were three issues raised on appeal. I plan to address two of them today. The third issue, the unconstitutionality of the Honest Services Fraud Statute, is the subject of an en banc opinion. Didn't we address that in our en banc opinion, Mr. Smith? We did, Your Honor. If memory serves, the opinion was authored by you. It was. This is the third time I've heard this. An opinion I respectfully disagree with. Your objection is duly noted. So I raised that both in the district court and on the appeal in order to preserve it for any future proceedings that might or might not occur. The two issues that I will address today is the delay in bringing Mr. Djordjevic before magistrate after his arrest and the discovery violation in which a witness for the government testified that Mr. Djordjevic had, in fact, essentially confessed to elements of the offense that that information had not been disclosed prior to the time of the rather surprising testimony from the witness during the course of trial. Very briefly on the first issue, Mr. Djordjevic was arrested on a federal warrant on February 3, 2008. He was interviewed by the agents, including U.S. Marshal Adler, on February 4 at 1.30 p.m. He wasn't brought before the magistrate until the following day. So the question under our case law, under Section 3501C, really is whether that period of delay until everything was concluded was reasonable because it clearly exceeded the six hours. So the question is whether it's reasonable. And it seemed to me, at least initially looking at it, that between the travel time and the fact that he was held by the state and people had to get there and so on and so forth, that it did seem reasonable under our case law. Why, in your view, was it an unreasonable delay? Your Honor, he was arrested on the federal warrant issued as a result of the charges against him in this case by state officers and lodged in a state jail. That's correct. And there weren't any federal people there to question him at that time. They had to travel, correct? They traveled from St. Louis to St. Charles, where the jail was located. That is a distance of 23 miles. That's not an unreasonable distance. He was held in a county jail, state county jail. The same as happens in our district here when someone is arrested on a federal warrant and they're held in the Spokane County Jail or the Benton County Jail or Yakima, they're held in county jails. There is a difference. We have contracts with the jails that you have mentioned, do we not, for holding federal prisoners? There's no evidence in this record as to whether or not the U.S. Marshals Service has a contract with the St. Charles County Jail for holding prisoners. The question is whether or not he was in federal custody as of the date of his arrest or state custody. And I think we have a finding, do we not, by the district court after an evidentiary hearing that he was being held on a state hold until the next day when he was released to the federal agents. But it wasn't the next day. It was two days later before he finally was released. Well, he was arrested on a Sunday night, and they interviewed him on Monday afternoon, and the agents asked, can we take him? And the jailer said, no, there's a hold on him. He's not ready to be released yet. So they came back the next morning and picked him up. Isn't that the sequence of events? That is the sequence of events. Why wouldn't that be reasonable? We have cases, or at least one case, that says that if people are not available to question, that's a good reason for delay. To determine whether somebody should be charged or not charged, that's a reasonable delay. So why isn't the problem of getting the paperwork dealt with a reasonable delay? Had he been taken to court on the date that he was questioned, because it was a Sunday evening, approximately 5 o'clock, I believe, that he was arrested. He was interviewed at 1.30 the following Monday. Right. So in your view, I guess what piece of that time is unreasonable? Are you saying that he should have been questioned on Sunday night by 11 p.m.? He was questioned at 1.30 Monday. That's not unreasonable. But an additional 24 hours to do the paperwork, this is someone who was arrested on a warrant, had never appeared before anybody. Okay. So it's the delay after the questioning that you're looking at as being unreasonable. Is that your position? It's not a trick question. I'm trying to understand what your claim is. I'm trying not to give a trick answer, Your Honor. The fact is it was 48 hours. Right, but which portions of that were reasonable in your view, or at least that the district court could properly have concluded that they were reasonable? An additional 24 hours after he was interviewed is unreasonable, given the proximity. If we had been talking about being held in some county 400 miles away from the magistrate, certainly that would be a different question. But what is a federal agent to do when he says to the jailer, I'd like to take this man into custody, and the jailer says he's not ready to be released to your custody? I don't have the necessary paperwork to release him. Does the marshal say, well, stand aside, or I'm going to arrest you for obstructing a federal officer? I don't think so. I think that there needs to be a more expeditious obtaining of the proper paperwork. Well, now, this man was being held by the state in addition to being held by the federal. He was being held by the state on the federal warrant. There was no separate so-called state hold on him? No. None at all? It was just that the jailer said there was? That appears to be the situation. Isn't that what Deputy Lamb testified to? I thought he used the word hold. Did I misread the record? Well, there was no separate state charge. Is that what you're saying? He was not being held on a state crime, but? That's correct. Okay. He was in the physical custody only of the state authorities. And I have really nothing to add further on that issue. I do believe the more important issue is the discovered violation. This case has been going on since February of 2008, and because of district court proceedings and then appellate court proceedings, on-bank hearing, we finally had the trial in March of 2014. There was in the discovery process submitted to counsel back in 2008 and then resubmitted following remand after the on-bank decision. A report from U.S. Marshal Adler indicating that during the course of his interview of Mr. Georgievic, Mr. Georgievic indicated that he had attempted to obtain a CDL in two other places. We're seeing Wisconsin and the St. Louis area. He discovered that there were difficulties, legal difficulties with those, so he terminated his inquiry to those. What was testified to was that Mr. Georgievic said that he knew not only that the Racine and St. Louis were illegal operations, but he also knew prior to coming to Spokane that it was illegal for him to do so. Now, against that was very much evidence that Mr. Georgievic did not know all the information or the legalities of what he was doing. Mr. Milovanovich, who was basically the ringleader of all this, testified that he didn't give Mr. Georgievic any information. He did not, for example, at the time that Mr. Georgievic had completed the written test and was given a passing grade on it and given the certificate to go to the clerk. The paperwork had an address, a Spokane address. It's not in a factual dispute that Mr. Georgievic did not live at that. Mr. Milovanovich, who was to provide interpretive services, did not assist him at the desk. Mr. Milovanovich also testified that the term residence has little meaning in the Serbian, Croatian, Bosnian language. You didn't try to prove that he lived at that Spokane address, did you? No. That address is not his address. He was living in the Midwest. This is part of the difficulty with the failure to provide, assuming that Mr. Georgievic did in fact make the statement, I knew what I was doing was illegal, but assuming that he made that statement, this is part of the difficulty. It was apparent as early as 2008 that the only defense available was one of lack of knowledge and intent. Is it your argument that the report failed to comply with the Federal Rules of Criminal Procedure? Is that your argument? That's the argument. What specifically is wrong with the report laid alongside the rule? The report indicates, just for example, that Mr. Georgievic said that he had attempted to obtain a license in Racine and St. Louis, but he found out there were legal problems. No discussion about what the legal problems were, no discussion about were they civil problems, were they criminal problems, but he discovered there were problems, so he withdrew from that. Why is that a violation of the rule? Why is it a violation of the rule? The statement was that he found out there were legal problems with those two situations, so withdraws, and the testimony is that he specifically stated he knew that he was violating the law when he did this, when he came to Spokane to get his driver's license. Mr. Smith, isn't this the issue that our panel addressed in United States v. Hoffman? It's essentially the difference between a written summary of an oral statement, and we dropped a footnote, number four in that opinion, in which we basically rejected the argument you were making because the mere fact of summarizing an oral statement could surely not transform it into a written recorded statement, which is really what you're asking for. To hold otherwise would render meaningless the distinction between oral and written statements under the rule. No, Your Honor, that is not what the argument is. It is not whether this was a reasonable summary. It's whether it's accurate, or we don't even need a written summary. But the rule doesn't require that every oral statement by a defendant be transcribed verbatim. The rule requires that written materials that ascribe statements to a defendant or statements that the defendant has made, which the government intends to offer in its case in chief that are memorialized perhaps in another witness's statement, be disclosed under Rule 16, so the defendant has some idea of what's going to be introduced against them and from whom it's going to come. The law does not require the agents to record their interviews so that you can hear exactly what he said. That's what you hear at trial when the agent testifies. That's what we hear at trial, but there is a huge step between any kind of summary of general information and a specific allegation, specific testimony, that a defendant in essence confessed to the crime. But what you're really arguing is that the agent's written report of his interview of your client was misleading because it didn't expressly state what he said in the interview, and the first time you heard about it was when the deputy was on the stand at the trial and basically said your client admitted that he knew it was illegal to be buying commercial driver's licenses that he didn't qualify for. That in essence is the argument, and I think that that, Your Honor, if I may, just my time has expired. It has, but we'll give you a couple of minutes for rebuttal because we used a lot of it with questions. Okay, thank you. Thank you. We'll hear from the government. Good afternoon. May it please the Court. My name is Joseph Harrington, and together with co-counsel Timothy Durkin, we're assistant United States attorneys for the Eastern District of Washington in Spokane. We were co-counsel during the trial of this matter, and we've been co-counsel on the appellate matters not only in this case but the prior cases that appeared within the night's trial. The trial was held here in this courtroom, right? No, the trial was in Spokane, Your Honor. Oh, Spokane. Yes. With the court's indulgence, I would respectfully request that I be allowed to address the constitutionality and the McNabb-Mallory 3501 issues, and my co-counsel be allowed to address the Rule 16. Sure. Thank you, Your Honors. And I would like to take no more than seven minutes. Good luck. Thank you, Your Honors. I think the Court's well aware of what the overview and the facts of this case are. It involved the defendant was charged with mail fraud, a scheme to defraud the Washington State Department of Licensing by depriving the Department of Licensing of the intangible right of honest services. It involved a bribery scheme involving a Department of Licensing driving skills tester who approved applicants without conducting an appropriate driving skills test. It also involved the bribery of a Department of Licensing approved Bosnian translator who helped applicants cheat on the written commercial driver's license. Counsel, I think we are all pretty familiar with the facts. Let me get directly to the question that I'd like your input on, which is why was the delay between the initial arrest on Sunday evening and the eventual presentment on Tuesday morning? I guess it was Tuesday morning. Yes, Your Honor. Why was that delay reasonable? In particular, opposing counsel seems to be focusing not so much on getting the federal agents there to talk to him, but on the period after that not taking him into magistrate before then. I understand. Judge Graber, the district court, Judge Shea, he considered this issue improper. I would submit properly rejected and denied the defendant's motion. What's our standard of review? The standard of review is de novo for the legal issue and deference to the district court for factual issues. Okay. So I think there's not much in the way of disputed facts here.  Here's how the facts go, Your Honor. First, there is a federal arrest warrant issued for the defendant based on an indictment that was issued the end of January of 2008. This was a Sunday, February 3rd, about 5 o'clock in the afternoon. The defendant, who was at the time driving an 18-wheeler, and I believe he pulled into something like a waste station. Okay, so he gets arrested by the state? By the Missouri State Patrol and is taken to the Charles County local jail. The next morning, which is Monday, February 4th of 2008, U.S. Deputy Marshal Alder and FBI Agent Hepperman are contacted and told that this individual has been arrested. Those two officers were familiar with the Bosnian language because they've been investigating and currently were investigating two similar commercial driver license schemes that were occurring in St. Louis. So they responded that morning because this was a similar scheme and he had been arrested. Right. So far, opposing counsel isn't concerned about the delay. And I may add real quick, Your Honor, remember now we're talking about the St. Louis metropolitan area, and the testimony in the record said it took him about an hour to get to the jail and they arrived at the jail, according to the record, about 115, 130. They processed through the jail and they began an interview of the defendant and that started about 140 that afternoon. The interview, according to the record, took about an hour and a half and then, according to the record, these federal deputy and special agent requested to take federal custody of the defendant and they were refused by the local county jail staff. That's at record. It's the excerpt of the record at page 53. In that record, when Deputy Alder was asked why they didn't take custody of the defendant, he said, we were at the Charles County Jail. We asked if we could take the defendant into custody and they said no. They were holding him. Counsel's argument is that that was unreasonable and that the processing of the paperwork by the state took too long. So there's two prongs, I think, Your Honor. So remember now, the defendant's not in federal custody until the following morning, which would be Tuesday. That's actually part of the problem. That's exactly the problem that the defendant is complaining about. Well, Your Honor, the government would take two positions, as we argued in our brief. First, it's the government's position that there wasn't a delay here because it's the government's position that on Tuesday, the following morning, the two agents went back to the Charles County Jail. They processed the defendant. Let me cut to the chase here. I understand your position to be that the time he's in state custody doesn't count, but that doesn't seem to me to square with either the language of the statute, which talks about detention in the custody of any law enforcement officer or law enforcement agency, or with our Halbert case, which says that other circuits have said state custody doesn't count, but we say it does. So what's your other argument? I understand, Your Honor. So the next phase of the argument, then the court has to look to determine whether the delay was reasonable or not, and there's several factors that go into that, including, among others, the processing of the defendant, whether the defendant, he or she, is in fact in state custody, the time frame. Here we're talking about a Sunday-Monday time frame. Well, no, really we're talking about Monday-Tuesday because counsel is concentrating on the fact that the state was dilatory, in his view, in processing the paperwork so as to allow the federal agents to take him immediately on Monday afternoon when they were finished talking to him. And I think the reasonableness, again, Your Honor, is coordinating with the state officers to allow them time to process. I think Judge Tallman has it right that the U.S. Marshals and the special agent from the FBI wouldn't have been in a position to hold them in contempt or obstructing justice in trying to arrest them. So when you look at really the broad policy of the reason for the rule, was there any suggestion of collusion with the federal agents and the state employees? Absolutely not. The record would belie that suggestion because the federal agents wanted to take custody of the defendant and they were— What time on Tuesday did they ultimately get him? Judge Graber, they arrived at the jail at about 930 in the morning. It took, according to the record, approximately half an hour to process the defendant out. So they left the jail at about 10 o'clock in the morning. They drove to the St. Louis, Missouri, Eastern District of Missouri Federal Courthouse, and the defendant was arraigned at or around 2 o'clock that afternoon. So it was approximately four hours between the time the defendant was brought into federal custody and presented to a federal magistrate in the Eastern District of Missouri. So to argue that somehow there was a broad collusive activity between the federal officers and the state officers and that the federal officers should be somehow responsible for that, I think doesn't comport with this court's recognition about reasonableness of delays. And I would submit respectfully to this court that clearly there was a reason and it was a reasonable basis to get the defendant to the magistrate approximately 2 o'clock. Mr. Harrington, I'm looking at Judge Shea's order at page 6, line 8, where he says the court finds the delay between the Sunday evening arrest and the Tuesday afternoon arraignment reasonable under these circumstances. Is that a factual finding or a mixed finding of law and fact? And to what deference do I apply to that? Your Honor, I think that's a mixed question of law and fact, I would submit. And I think what's the driving factor here is the facts, and I think the court under the standard has to defer to the district court with respect to that. So the historical facts of what time it was and what people's intent was when they did it, that's factual. The conclusion of reasonableness is for us to draw? Is that your position? That would be my suggestion, Your Honor, yes. Now was this a mistake on the part of the jailers that they thought they had a hold or was the underlying conduct, I presume, could have been a state crime also? Your Honor, I don't know. The record doesn't tell us? It doesn't tell us specifically. What we do know is that the defendant was arrested on the federal warrant and that the federal officers then asked to take custody of the defendant, and they were not allowed. They refused. But the question of why that occurred, I think, never has been answered. It's never been explored. That's my understanding of the record, Your Honor. But doesn't that explain the court's statement at line 14, there was no evidence that the delay was motivated by any desire to interrogate Mr. Dvořávek before arraignment, rather the delay was due to practical difficulties associated with transferring an individual from state to federal custody? That's exactly right, Your Honor. That's a finding of fact, is it not? Yes, I believe that is, Your Honor. Okay. It would be a finding of fact. So I believe my... He has five minutes. So I'm going to defer to my co-counsel, Your Honor, unless there's any further questions. Thank you, Your Honor. Thank you, Mr. Harrington. May it please the Court, Your Honors. My name is Tim Durkin, along with my co-counsel, Mr. Harrington. I will address the issue relative to the Rule 16 discovery issue that's been raised. I believe Judge Tallman has cited the case, the U.S. v. Hoffman. We had cited that case as part of our materials. Certainly, that was a case that was cited in front of the Honorable Edward F. Shea at the time of the trial. Judge Shea does sit in this courtroom, Your Honor. We're well aware of that. Yes, and I'm sure he's been a very congenial host. He has. Indeed. As has Judge Mendoza. Yes, and Judge Mendoza as well. The defendant in this case likes to excerpt the one word, there were legal problems relative to the 302, and focuses solely on the 302, of course, and made no reference in his argument relative to the other transcript that was provided to him and his client. And that was at the time of the testimony provided by Deputy Marshal Adler during the August 21st, 2008, motion to suppress and motion to dismiss that took us on a length of your journey to get where we are now. And that testimony supplemented, certainly, specific statements, and we outlined those in rather a detailed fashion, or at least we think so, in our brief on pages 35 to 40. So is your position that discovery consisted of both the FBI form 302 report of investigation and the testimony from the pretrial suppression hearing? So the defense can't say that they were surprised at trial as to what the deputy said, Mr. Smith's client said during the interview? That's correct, Your Honor. We believe the 302 by itself still suffice under the Ninth Circuit precedent, U.S. Hoffman among others, and other circuits' decisions that we cited. For instance, U.S. v. Walke, in addition to U.S. v. McClure out of the Tenth Circuit, that a summary is sufficient to provide the defendant of the nature of the substance of his statements that were made during the course of this one-and-a-half-hour interview that occurred at the St. Charles, Missouri County Jail. Those two items in combination, and certainly within the context of this case and who those investigators were at the time that they interviewed the defendant, had to put the defendant on notice that when they were talking about legal issues, and they were talking about schemes in Wisconsin, Illinois, two ongoing prosecutions in Missouri, and also the scheme in Spokane for which the defendant had been arrested, advised of his rights, and agreed to voluntarily cooperate with the interview, certainly the term there were legal issues had to connote that there were criminal legal issues because they were being interviewed by criminal investigators. And those criminal investigators had been involved in the case of U.S. v. Redzic, which is out of the Eighth Circuit, that was charged, that did not encounter difficulties at the district court in terms of charging and proceeding through on the theft of honest services, the fraudulent deprivation of honest services in that case. I guess I'll save my parenthetical comment. The United States respectfully submits that the trial court here, Judge Shea, made a very reasoned and thorough analysis of the defendant's claim of lack of notice relative to the explicit statements that he took issues with at the time of the trial. Judge Shea, who sat and observed all of the witnesses and the exhibits and evidence that was admitted at the time of the trial, concluded that really, and the United States submits, that the defendant took the position, as counsel admitted in his opening argument, that the only defense in this case for them was to try to explore an innocence defense. And therefore, they looked at this 302, respectfully submit, with blinders and decided to focus on a self-created ambiguity relative to there were legal problems. And instead of realizing that those legal problems arose in the criminal context of the investigation, decided to extrapolate and say, well, there could have been civil legal problems. There could have been administrative review legal problems. And you didn't say, Deputy Adler, specifically what those legal problems were. Deputy Adler says, I was a criminal investigator. I was involved in two criminal investigations relative to identical schemes being perpetuated in the Missouri District. I was aware of other schemes in Wisconsin. I was aware of a scheme in Illinois. And the defendant acknowledged and talked to the officers during the course of that investigation, acknowledged he was aware, acknowledged that he had attempted to buy for $2,500 cash, CDLs in each of those schemes, until he was able to get ahead of the curve, law enforcement curve, and participate in the scheme that Mr. Milibonovich and Mr. Tony Lamb had created in the state of Washington. Thank you, counsel. The government's time has expired. Thank you. Mr. Smith, you may have two minutes for rebuttal. Thank you. And I believe Mr. Durkin considerably overstated even what the reports say. Mr. George Vick at no time talked about attempting to spend money in Wisconsin or St. Louis. The issue is at the time that he was interviewed, what did he say about what he knew and what he intended to do in Spokane, Washington, when he came out here? Certainly we can pick a time from the date he was interviewed to today's date. Does he know now that using the address that he used does not comply with residency requirements? Of course he does. What's your response to the government's argument that you got a fair amount of additional discovery in the testimony that was offered at the pretrial hearing on the motion to suppress? I completely disagree. If you review that transcript, there is nothing in there to indicate that he said anything more than what was in the report about knowing about these situations where he possibly could obtain a CDL in Wisconsin and St. Louis. There was nothing in that testimony. I thought there was testimony by the deputy that he told your client at the jail that he had been investigating a similar scheme in Missouri, and your client told him that he had abandoned efforts to try and get a driver's license in other states because of legal problems. Wasn't that discussed? At the time that he was interviewed, this was after the time, of course considerably after the time, that Mr. Djordjevic was in Spokane to get the license. Yes, the deputy said, we've been investigating these. And Mr. Djordjevic said, well, you know, I looked into Racine, I looked into St. Louis, but I left them because of legal problems. And just very quickly, I would say in the briefing, I pointed out all of the things that indicate that Mr. Djordjevic did not know, and without the surprise testimony, a jury could not have reasonably found him guilty. Thank you, counsel. The case just submitted. We thank all three counsel for their helpful arguments.
judges: Leavy, Graber, Tallman